UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PAULA J. JACKSON, | ) | CASE NO. 4:16CV1217 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| NANCY A. BERRYHILL,[1] | ) | |
| ACTING COMMISSIONER OF | ) | REPORT AND RECOMMENDATION |
| SOCIAL SECURITY, | ) | OF MAGISTRATE JUDGE |
| | ) | |
| Defendant. | ) | |

Plaintiff Paula J. Jackson ("Plaintiff") requests judicial review of the final decision of the Commissioner of Social Security ("Defendant") denying her application for disability insurance benefits ("DIB"). ECF Dkt. #1. In her brief on the merits, Plaintiff asserts that the administrative law judge ("ALJ"): (1) erred in her assessment of Plaintiff's credibility; and (2) lacked substantial evidence for her residual functional capacity ("RFC") determination because she did not account for Plaintiff's bilateral carpal tunnel syndrome ("CTS") and bilateral ulnar palsies. ECF Dkt. #16.

For the following reasons, the undersigned RECOMMENDS that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case in its entirety with prejudice.

## I.     FACTUAL AND PROCEDURAL HISTORY

On December 15, 2011, Plaintiff filed an application for DIB alleging disability beginning October 17, 2010 due to congestive heart failure, a 4 cm aneurysm ascending thoracic aorta, hypertension, asthma, dilated carotid artery, mild subacromial/subdeltoid bursitis, degenerative changes in the AC joint with mild associated impingement, and arthritis. ECF Dkt. #12 ("Tr.") at 161, 206.[2] Plaintiff's claims were denied initially and upon reconsideration. *Id.* at 81-106, 109-15.

---

[1] On January 20, 2017, Nancy A. Berryhill became the acting Commissioner of Social Security, replacing Carolyn W. Colvin.

[2] All citations to the Transcript refer to the page numbers assigned when the Transcript was filed in the CM/ECF system rather than the page numbers assigned when the Transcript was compiled. This allows the Court and the parties to easily reference the Transcript as the page numbers of the .PDF file containing the Transcript correspond to the page numbers assigned when the Transcript was filed in the CM/ECFsystem.

Plaintiff requested a hearing before an ALJ, and a hearing was held on March 19, 2014, during which Plaintiff, represented by counsel, and a vocational expert ("VE") testified. *Id.* at 41, 128. On April 18, 2014, the ALJ issued a decision denying Plaintiff's DIB claim. *Id.* at 21-34. Plaintiff requested review of the ALJ's decision and the Appeals Council reviewed the brief of Plaintiff's counsel, as well as additional medical evidence. *Id.* at 6-15. On March 16, 2016, the Appeals Council denied Plaintiff's request for review. *Id*. at 1-5, 247-255.

Plaintiff filed the instant suit seeking review of the ALJ's decision on May 20, 2016. ECF Dkt. #1. On September 28, 2016, Plaintiff filed a brief on the merits. ECF Dkt. #16. Defendant filed a merits brief on December 12, 2016. ECF Dkt. #19. Plaintiff filed a reply brief on January 9, 2017. ECF Dkt. #21.

## II.     **RELEVANT MEDICAL AND TESTIMONIAL EVIDENCE**

Since Plaintiff challenges the ALJ's credibility determination and her failure to account for Plaintiff's CTS and bilateral ulnar palsies, the undersigned will conduct a brief but relevant medical history review with focus on these two particular conditions and review of other impairments for background purposes only.

### A.     **Medical Evidence**

Plaintiff treated with doctors at St. Joseph Health Center Community Care and Drs. Obeng and Curtiss of Humility of Mary Health Partners Community Care in 2009 and 2010 for lower extremity edema, rash and tingling, a history of hypertension, allergic rhinitis, plantar fasciitis, and increased fatigue. Tr. at 268-278. She underwent tests for connective tissue disease and vasculitis, and those results were negative. *Id*. at 269. She was diagnosed with lower extremity rash, paresthesias and edema, obesity, hypertension, plantar fasciits, and allergic rhinitis. *Id.* The doctors planned to carefully watch the paresthesia and rash and to perform a diabetes workup or refer Plaintiff to a rheumatologist if the symptoms persisted. *Id.* at 266. They also prescribed medications for hypertension, rhinitis, and edema, and home exercises for plantar fasciitis. *Id.*

On October 17, 2010, Plaintiff presented to the emergency room after slipping and falling on a wet floor at work. Tr. at 462. Physical examination showed perfectly normal range of motion in the left shoulder and examination of the left leg showed no tenderness, although the left thigh had

tenderness, but full range of motion. *Id*. X-rays of the left shoulder and left hip were negative. *Id*. at 460-461. She was diagnosed with multiple contusions and told to take Darvocet that she already had at home, to apply ice, and to stay home from work the next day. *Id*. at 462. .

On December 8, 2010, Plaintiff presented for an evaluation of her left shoulder by Dr. Jones, an orthopedist, after she reported persistent left shoulder and buttock pain after her fall at work. Tr. at 457. Physical findings showed pain upon biceps provocation, good strength and some pain with reaching up overhead, and good pulses. *Id*. Dr. Jones diagnosed status post left shoulder contusion and possible labral pathology. *Id*. He noted that he did "not think that she did anything really bad" to her shoulder. *Id*. He recommended a MRI arthrogram and physical therapy. *Id.*

February 9, 2011 progress notes from Dr. Obeng indicate that Plaintiff had a lump on her right hip that she had since her fall at work. Tr. at 550. He noted that Plaintiff denied chest pain, abdominal pain, muscle aches, paresthesias, weakness, depression, or anxiety. *Id*. Physical examination revealed present and bounding pulses in the extremities with no abnormal texture findings but a 2cm by 2cm lipoma in the right inguinal crease. *Id.* He diagnosed right hip lipoma, suspected lupus, hypertension and back pain. *Id.* His plan was to watch the lump, order blood tests for lupus and other disorders, refill her blood pressure medications, and follow-up with the chiropractor for her back pain. *Id.*

Plaintiff presented to Dr. Barton on March 16, 2011 concerning the lump in her right hip crease. Tr. at 551. She believed that it was getting larger and it was achy. *Id.* Plaintiff denied chest pain, abdominal pain, muscle aches, paresthesias, weakness, depression of anxiety. *Id*. Physical examination revealed present and bounding pulses in the extremities with no abnormal texture findings but a 3cm by 1cm lipoma in the right inguinal crease. *Id.* Dr. Barton diagnosed right inguinal hip lipoma, suspected lupus, hypertension and chronic back pain. *Id.* However, she noted that Plaintiff's rheumatological tests were negative for lupus and Plaintiff was stable on blood pressure medications. *Id.* at 552.

On April 7, 2011, Dr. Bartos conducted an independent medical examination for the worker's compensation agency. Tr. at 527. He noted her complaints of left shoulder pain radiating to her right shoulder and down her right arm, pain in her trapezius muscles, and left hip pain radiating

-3-

down her back. *Id*. at 528. He indicated that Plaintiff was released to return to work without restrictions nine days after her injury but when she returned, she found out that she had been fired. *Id*. Dr. Bartos reviewed Plaintiff's medical records and found upon physical examination that Plaintiff had a normal gait, no redness, warmth or swelling of the left shoulder, no bruising on the left hip, pain in both the shoulder and hip on palpation, and normal upper extremity and left leg strength and reflexes. *Id*. at 529. Dr. Bartos opined that Plaintiff had reached maximum medical improvement as the injury was six months old and was allowed merely for simple contusions. *Id*. at 530. He concluded that ongoing symptomatology was related to non-allowed conditions. *Id*. He further opined that Plaintiff could return to her prior work as a state tested nurse's aid as she was already released to do so on October 25, 2010. *Id*. at 531.

On April 13, 2011, Plaintiff presented to the doctor complaining of a palpable mass in her right groin that had grown since she first felt it in December of 2010. Tr. at 592. She was on antibiotics but it did not decrease in size. *Id*. She was diagnosed with an enlarged right groin lymph node. *Id*. at 595.

On April 20, 2011, Chiropractor Day conducted an independent peer review of a worker's compensation request for treatment and services from Dr. Martuccio for Plaintiff. Tr. at 525. Dr. Day opined that the medical services were not reasonably related to Plaintiff's work injury of allowed contusions as the contusions were over six months after the injury and were well beyond the expected period of recovery. *Id*.

On May 25, 2011, Plaintiff presented to Dr. Obeng for follow up of her asthma and chronic upper right arm pain. Tr. at 553. Plaintiff denied chest pain and abdominal pain and physical examination revealed mild pitting edema in the ankles. *Id.* Dr. Obeng diagnosed allergy induced asthma, right inguinal lymphadenopathy, suspected lupus, slight peripheral edema, hypertension and chronic back and right arm pain. *Id.* He noted that Plaintiff had a biopsy performed on the hip lump and was awaiting results, she tested negative for lupus, and he increased Plaintiff's Lasix for the edema, told to follow up with Dr. Martuccio for her back pain, and recommended over-the-counter Tylenol and Ibuprofen for her right arm pain. *Id.* at 552.

-4-

On August 29, 2011, Dr. Martuccio, D.C. ordered medical imaging of Plaintiff's left arm which showed degenerative changes in the AC joint with mild associated impingement on the distal supraspinatus, evidence of mild supraspinatus tendinosis and/or tendinopathy without definite rotator cuff tear, and evidence of mild subacromial/subdeltoid bursitis.  Tr. at 388.

Dr. DeChellis issued a report for an independent medical evaluation of Plaintiff at the request of the worker's compensation bureau on February 21, 2011.  Tr. at 380.  Plaintiff complained of constant pain and spasms, feeling off balance when she walked, and hearing a grinding noise in her spine and hip when she walked.  *Id.* Physical examination showed limited ranges of motion in the spine, left shoulder and buttock, as well as tenderness, and a normal gait.  *Id*. at 381.  Based upon the medical records and tests, as well as his physical examination of Plaintiff, Dr. DeChellis substantiated Plaintiff's claim for temporary total disability from October 18, 2010 to the present based upon the workplace injury of October 17, 2010.  *Id*. at 382.

On October 17, 2011, Dr. Martuccio wrote a letter clarifying Plaintiff's injuries and condition.  Tr. at 392.  He indicated that Plaintiff's injuries shown on the August 29, 2011 MRI were caused by her slip and fall on October 17, 2010.  *Id.*  He indicated that the injuries would take some time to heal and when worker's compensation starts and stops Plaintiff's treatment, it lengthens the recovery time.  *Id.*  He requested that Plaintiff be approved to continued to treat with them, and that Plaintiff be able to see a medical doctor in order to receive medication for pain relief and to have the swelling assessed that she still had in her joint.  *Id.*

On October 24, 2011, Plaintiff presented to the emergency room complaining of chest pain and pressure that began one hour prior.  Tr. at 293.  She explained that she had this problem for the last two weeks and she went to urgent care twice and the emergency room and they sent her home with steroids.  *Id.* at 304.  The chest pain started becoming a sharp pain and going to her left arm, so she came to the emergency room.  *Id*.  A heart scan, cardiac enzymes, a stress test, and a lung scan were unremarkable, but a chest CT showed a 4 cm aneurysm ascending her thoracic aorta.  *Id*. at 310-333.  Plaintiff's liver enzymes were also elevated and she was found to have acute pancreatitis.  *Id*. at 292, 307.  Plaintiff was discharged from the hospital three days later.  *Id.*

On November 2, 2011, Plaintiff presented to Dr. Obeng for follow up of her chest pain. Tr. at 554. He noted that the CT scan showing an ascending aortic aneurysm that was 4 cm in diameter but had been stable since 2007. *Id*. He indicated present and bounding pulses in the extremities with non-pitting edema in the lower extremities. *Id.* Dr. Obeng diagnosed chest pain with negative cardiac workup, GERD, allergy induced asthma, hypertension, slight peripheral edema, chronic back pain, and stable right arm pain. *Id.* He indicated that Plaintiff was going to see Dr. Weitzel, a cardiologist and he prescribed a GERD medication, continued her asthma, blood pressure, and edema medications, and told her to follow up with Dr. Martuccio for her back pain. *Id.*

On November 11, 2011, Dr. Kramarich, D.C., conducted an independent medical evaluation for allowance of a medical doctor visit for pain medications, a TENS unit from the doctor, and physical therapy. Tr. at 401-402. He reviewed Plaintiff's medical records, the history of Plaintiff's injury, and noted Plaintiff's complaints of stabbing/pulling pain in her left shoulder with spasms, as well as achy left buttock pain. *Id.* at 402. Upon physical examination, Dr. Kramarich noted non-antalgic posture, normal gait, difficulty with toe and heel walk, tenderness of the left supraspinatus tendon and subacromial region, range of motion testing, and diminished sensation. *Id.* at 403-404. Dr. Kramarich opined that physical therapy and treatment by a medical doctor for pain medication and a TENS unit were not necessary and appropriate for the allowed conditions. *Id*. at 404.

On January 11, 2012, Dr. Martuccio completed a form indicating that he first examined Plaintiff on January 19, 2011 and last examined her on August 8, 2011. Tr. at 281. He noted that Plaintiff had lumbar spine abnormalities as she had limited range of motion and moderate spasms with no radiculopathy reported and a normal gait. *Id.* He also opined that she could perform fine and gross manipulation. *Id*. at 281. He attached his progress notes. *Id*. at 283-287.

On January 16, 2012, Dr. Weitzel, a cardiologist, evaluated Plaintiff at the request of Dr. Obeng. Tr. at 357. Dr. Weitzel reviewed Plaintiff's cardiac history, including a carotid artery dilation of the left internal carotid artery in 1988 with no transient ischemic attack or cerebral vascular accident. *Id*. He indicated that Plaintiff did have hypertension and was in the hospital in October of 2011 for chest pain and a chest x-ray showed a 4 cm aortic aneurysm. *Id.* Apparently, Plaintiff was told by that hospital to follow up with Dr. Obeng and not to return to Trumbull

-6-

Memorial because it was a "for profit" hospital and she had no health insurance. *Id.* Dr. Weitzel recommended that Plaintiff have an echocardiogram, a carotid ultrasound, and a repeat MRA of the thoracic aorta within six months. *Id.* He also strongly recommended that Plaintiff be referred to vascular surgery to follow the aneurysm and he started her on Atenolol. *Id.* Physical examination showed no rash, no carotid bruit, clear lungs, normal sinus rhythm, no murmur or gallop and no edema in the extremities. *Id.* at 358. Dr. Weitzel noted that Plaintiff appeared fairly stable except for her blood pressure, which was 140/90. *Id.* at 358-359.

On January 25, 2012, Dr. Masternick wrote a "To Whom it May Concern" letter indicating that he was treating Plaintiff for her worker's compensation injury and he diagnosed her with left shoulder sprain/strain, left shoulder bursitis, left shoulder adhesive capsulitis, and left shoulder degenerative joint disease which related directly to her worker's compensation claim. Tr. at 387.

On February 1, 2012, Plaintiff presented to Dr. Obeng complaining of persistent right arm pain. Tr. at 369, 556. She followed up after meeting with her cardiologist and reported that her imaging studies at the hospital showed evidence of aortic aneurysm and she was started on Atenolol. *Id.* She denied chest pain or abdominal pain, shortness of breath or visual changes. *Id.* Physical examination showed no cardiovascular abnormalities, normal pulses in the extremities with no cyanosis of edema, and slightly increased thoracic kyphosis. *Id.* at 370. Dr. Obeng diagnosed aortic aneurysm, GERD, allergy induced asthma, hypertension, slight peripheral edema, chronic back pain, chronic right arm pain that was stable, and osteoarthritis. *Id.*

On March 9, 2012, Plaintiff underwent a CT of her chest which showed no changes in the aortic aneurysm and no evidence of rupture, but did show mild bilateral lung dependent subsegmental atelectasis and mild linear scar within lingula and right middle lobe of lung. Tr. at 565. A MRA of the chest showed an aneurysmal dilation of ascending thoracic aorta measuring up to 4 cm without evidence of thoracic aortic aneurysm and 30% focal stenosis of the proximal celiac artery. *Id.* at 568.

On April 10, 2012, Plaintiff underwent an independent medical examination/occupational medicine consultation for worker's compensation purposes to determine additional allowances of left shoulder sprain/strain, degenerative joint disease of the left shoulder, shoulder bursitis, left

shoulder impingement syndrome and left shoulder capsulitis.  Tr. at 375.  Dr. Trangle reviewed Plaintiff's medical history and her current worker's compensation claims and conducted a physical examination which led him to opine that Plaintiff had progressively worse right shoulder problems, but not significant enough test results and clinical findings to allow the left shoulder conditions alleged.  *Id*. at 379.  He noted that MRIs showed mild degenerative changes in the left shoulder, slight impingement of the AC joint and mild spurring on the left, and some mild increased signal with supraspinous tendon and a tiny amount of subdeltoid fluid suggesting earlier bursitis.  *Id*.  He recommended that Plaintiff have a workup for arthritic disease including rheumatoid arthritis and other connective tissue diseases, additional MRIs of the neck and right shoulder, and an EMG/nerve conduction study to the upper extremities.  *Id.*

On May 2, 2012, Plaintiff presented to Dr. Alexander for follow up of her arm and neck pain. Tr. at 558.  Physical examination showed no cardiovascular abnormalities, and normal pulses in the extremities with no cyanosis of edema.  *Id*.  Dr. Alexander diagnosed osteoarthritis with chronic right arm pain, he ordered tests for rheumatologic conditions and he advised her to double up on pain medication.  *Id*.  He also diagnosed aortic aneurysm, GERD, allergy induced asthma, hypertension, slight peripheral edema, and chronic back pain.  *Id*.

Drs. Obeng and Alexander ordered a lumbar spine MRI on July 25, 2012 which showed L4-L5 annular tear with disc bulge with no stenosis, L5-S1 annular tear with small disc bulge, altered signal involving the T2 through S4 levels in addition to bilateral iliac bone showing degenerative change or fatty marrow conversion, and multilevel facet joint hypertrophy.  Tr. at 580.  A July 25, 2012 MRA of the chest showed that the ascending thoracic aorta measured less than 4 cm and would therefore be classified as mild ectasia and not aneurysmal.  *Id.* at 581.  It was noted that follow up examination could be in 6 months.  *Id.*  The MRA also showed mild narrowing of the trunk of the celiac artery.  *Id.*

A March 6, 2013 MRA of the chest showed that the ascending aorta measured 3.9 cm by 3.6 cm.  Tr. at 664, 831.  No aneurysmal dilation was noted.  *Id*. at 665.  A carotid bilateral test showed no hemodynamically significant stenosis of the carotid arteries.  *Id*. at 666.

On June 30, 2013, Plaintiff presented to the emergency room with toe pain as her son had dropped a heavy object on them. Tr. at 797. X-rays showed a left comminuted but nondisplaced fracture of the distal phalanx of the great toe and a small avulsion fracture of the base of the distal phalanx of the right great toe. *Id*. at 799. She was given pain medication and released. *Id*. at 800.

On July 19, 2013, Plaintiff presented to the Cleveland Clinic Cardiovascular Imaging department for assessment of her aortic aneurysm. Tr. at 743-746. She reported that she experienced chest pain that felt "like a knife" that lasts for 2-3 minutes that goes on all day. *Id.* at 744. Physical examination indicated clear lungs, regular heart rhythm, and no murmur. *Id*. at 745. Her extremities showed no peripheral edema. *Id*. Dr. Popovic opined that Plaintiff had minimal stable aortic ectasia and known hypertension. *Id*. at 746. He noted no change in aortic size over five tomographic imaging studies that were all congruent. *Id*. He concluded that he saw no need for activity limitations except for heavy lifting of 35 pounds or more. *Id*. He indicated that her condition posed a minimal risk. *Id.*

On July 21, 2013, Plaintiff began treatment at the Ohio Institute of Pain Management with Dr. Masternick for her low back pain, and neck, shoulder, foot, leg and upper extremity pains. Tr. at 699. She received traction, joint injections and epidural injections. *Id.* at 668-699. X-rays of Plaintiff's right elbow and left shoulder were normal. *Id*. at 710-711. X-rays of Plaintiff's lumbar spine showed low grade facet and vertebral body arthropathy with disc space narrowing at L4-L5 and L5-S1. *Id*. at 709. Thoracic spine x-rays indicated low grade bony hypertrophy with disc space narrowing at all levels T9-T12. *Id*. at 708. Cervical x-rays showed low grade bony hypertrophy with disc space narrowing at C6-C7. *Id*. at 707.

On August 8, 2013, Plaintiff presented to Dr. Obeng and reported that Dr. Masternick was treating her spine pain and she was getting relief from Norco that she took as needed. Tr. at 654. She also indicated that Dr. Masternick increased her Cymbalta which was providing "somewhat" more relief. *Id.* She reported no constitutional symptoms and indicated that her allergies and leg swelling were under control. *Id*. at 654-655.

A motor nerve study ordered by Dr. Masternick on August 9, 2013 showed early CTS and bilateral ulnar palsies at the elbows. Tr. at 729. A peripheral neuropathy was also posited. *Id.* Clinical correlation and repeat testing in 3-4 months were suggested. *Id.*

In August of 2013, Plaintiff presented to the emergency room and to various doctors regarding a possible spider bite that left wounds in her left lower abdominal wall wound with pain, swelling, erythema and increased temperature. Tr. at 756, 800. She was diagnosed with an abscess and cellulitis of the abdominal wall of questionable etiology. *Id*. at 765. She was admitted and her wounds were drained and packed. *Id*. at 768-770, 802-811. She followed up to have the wounds drained and repacked. *Id*. at 759, 823-825.

On September 12, 2013, Plaintiff presented for an adult psychiatric evaluation after she complained of stress and feeling overwhelmed. Tr. at 651. It was indicated that Plaintiff was not impaired in orientation, judgment, comprehension, reality testing, affective expression, personality traits, psychomotor activity, social skills, suicidal or homicidal thoughts or in thought processes. *Id*. at 653. She was rated as mildly impaired in memory, insight, self-esteem and impulse control, and she was moderately impaired in depression, anxiety and guilt, and in attention and concentration. *Id.* She was found to be severely impaired in cooperation and motivation. *Id.* She was diagnosed with major depressive disorder of a moderate nature and rated a 55 on the global range of functioning chart ("GAF"), which indicated moderate symptoms. *Id*. Individual psychotherapy was

recommended. *Id*. at 652.

A motor nerve study ordered by Dr. Masternick on October 22, 2013 showed multiple abnormalities suggesting a peripheral neuropathy and a left S1 radiculopathy. Tr. at 717. A MRI was suggested and retesting in 3-4 months. *Id*.

Left hip x-rays ordered by Dr. Masternick on November 12, 2013 showed low grade bony hypertrophy with mild joint space narrowing. Tr. at 706.

Upon follow up for the spider bite on December 12, 2013, Plaintiff reported no complaints besides feeling congestion with a runny nose. Tr. at 659. She denied chest pain, muscle aches,

-10-

depression or anxiety, and physical examination showed intact pulses and normal thoracic and lumbar curvature with good range of motion. *Id*. at 660-661.

On December 19, 2013, Plaintiff reported to Dr. Masternick that the epidural injections had made a definite improvement in her condition. Tr. at 671. Physical examination showed increased range of motion in the lumbar spine and decreased tenderness to palpation. *Id*.

January 17, 2014 progress notes from the Ohio Institute of Pain Management show that Plaintiff presented for her left shoulder, trapezius, and buttocks pain that increased with movement. Tr. at 670. She rated the pain intensity at an 8 most of the time. *Id*. She was diagnosed with degeneration of the lumbar spine and continuation of her treatment plan was recommended, which included epidural injections that she reported improved her condition, increased her range of motion and decreased tenderness to the spine. *Id*.

February 20, 2014 and March 20, 2014 notes from PsyCare indicate diagnoses of major depressive disorder, single episode, chronic pain disorder with psychological factors, and a rule out of bipolar disorder. Tr. at 876-878. Plaintiff was prescribed medications. *Id*.

### B. Hearing Testimony

The ALJ held a videoconferenced hearing on March 19, 2014. Tr. at 43. Plaintiff, her counsel, and a VE appeared for the hearing. *Id.* Following an opening statement made by Plaintiff's attorney, the ALJ briefly examined Plaintiff, who indicated that she was injured at work on October 17, 2010 when she slipped on some water and fell, landing on her left side. *Id*. at 43-47. Plaintiff indicated that she lived with her husband and her adult son. *Id*. at 47. She reported that she has a driver's license and drives very seldom alone because she has an aneurysm and "never know[s] when it's going to pop." *Id*. at 48.

When asked why she could not work, Plaintiff responded that she could not do things that she used to as she could not lift and often has to call her daughter or ask her husband or son to do things for her. Tr. at 60. She related that she could not stand for a long period of time, she could not lift objects or clean her house because of the pain, and she gets frustrated and depressed. *Id.* at 60-61. She used to make crafts and do things with her grandchildren, but she could no longer do things and just lost interest. *Id.* at 61. She tries to cook dinner, but her son, husband, daughter or

-11-

daughter-in-law have to help. *Id.* at 62. She has trouble sleeping and she still has issues with leg edema as her legs swell in the morning or when she does not wear prescribed stockings. *Id*. at 63-65. Plaintiff testified that she has been going to a pain management doctor for a year and they had done epidurals, but they did not help. Tr. at 66. She related that she just started with a different pain management doctor who prescribes pain medications and does nerve blocks. *Id.*

The VE was then questioned by the ALJ. Tr. at 68. The ALJ asked the VE to consider a hypothetical individual with the same age, education, and work experience as Plaintiff that would be able to lift/carry objects up to 20 pounds occasionally and 10 pounds frequently; sit and stand and/or walk for 6 hours of an 8-hour day; frequently push and pull with left upper extremity; occasionally overhead reach with the left upper extremity; frequently climb ramps and stairs and kneel, crouch and crawl; occasionally climb ladders, rapes and scaffolds; and occasionally stoop. Tr. at 72. The VE testified that such an individual could perform Plaintiff's past relevant work as a customer service representative, a cashier check, and a sales clerk. *Id.* The VE also testified that such an individual could perform additional jobs such as a cafeteria attendant, cashier II, and an inspector and hand packager. *Id.* at 72-73.

The ALJ then posited a second hypothetical individual with all the same limitations as the first hypothetical individual, but with the limitation to sedentary work. Tr. at 73. The VE indicated that such a hypothetical individual could perform Plaintiff's past relevant work as a customer service representative, collections clerk and telephone solicitor, and she would also be able to perform the other job of credit clerk. *Id.* at 73-74. For his third hypothetical individual, the ALJ asked the VE about the ability to alternate sitting and standing and the VE responded that the Dictionary of Occupational Titles ("DOT") does not address sitting or standing, but his experience was that the individual has the flexibility to stand and sit. *Id*. at 74.

The VE was then questioned by Plaintiff's attorney. Tr. at 76-78. Counsel asked the VE whether any jobs were available for a hypothetical individual who had to elevate her legs waist high when necessary. *Id.* The VE responded that no jobs were available with this limitation. *Id*. at 78.

**III.  SUMMARY OF RELEVANT PORTION OF THE ALJ'S DECISION**

-12-

In her April 18, 2014 decision, the ALJ determined that Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date through her date last insured. Tr. at 23. The ALJ also determined that Plaintiff had the following severe impairments: obesity; aortic aneurysm/ascending aortic aneurysm; carotid artery stenosis; osteoarthritis; mild degenerative joint disease of the cervical spine thoracic spine, and hip; degenerative disc disease of the lumbar spine with chronic back pain; degenerative disc disease of the left arm; and degenerative changes of the AC joint with mild associated impingement. *Id.* The ALJ then determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 26.

After consideration of the record, the ALJ found that Plaintiff had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that Plaintiff was limited to: frequently pushing and pulling (including operating hand and foot controls) with the left upper extremity; frequently climbing ramps and stairs, frequently kneeling, crouching and crawling; occasionally climbing ladders, ropes and scaffolds; occasionally stooping; occasionally reaching overhead with the left upper extremity; and the ability to switch positions at will. Tr. at 26. Following the RFC finding, the ALJ found that Plaintiff could perform her past relevant work as a customer service representative and alternatively, she could perform jobs existing in significant numbers in the national economy, such as the jobs of collections clerk, telephone solicitor and credit clerk. *Id.* at 33. In conclusion, the ALJ found that Plaintiff was not under a disability, as defined in the Social Security Act during the relevant time period. *Id.* at 34.

### IV. STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.	STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard

creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001).  However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record."  *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI. LAW AND ANALYSIS

### A. Credibility Determination

Plaintiff first asserts that substantial evidence does not support the ALJ's credibility determination because she failed to explain her determination adequately and used only blanket assertions that Plaintiff's pain allegations and limitations were "not entirely credible."  ECF Dkt. #16 at 20-21.  Plaintiff contends that the ALJ's only attempt to evaluate her credibility was her statement concerning Plaintiff's long gap in treatment, which was not an indication of improvement, but rather was due to her fight against the worker's compensation bureau for denying her claim for such treatment.  *Id*. at 21.

The social security regulations establish a two-step process for evaluating pain. See 20 C.F.R. § 404.1529, SSR 96–7p.  In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.*; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir.1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038–1039 (6th Cir.1994); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir.1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

-15-

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96–7p. See SSR 96–7p, 61 Fed.Reg. 34483, 34484–34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039–40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility should accord great deference to that determination. *See Casey*, 987 F.2d at 1234. Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997).

Upon review of the ALJ's decision, the undersigned recommends that the Court find that the ALJ more than adequately conducted a credibility analysis. In her decision, the ALJ cited to the proper two-step process in evaluating Plaintiff's credibility. Tr. at 27. She then cited to Plaintiff's testimony concerning her inability to work due to physical issues. *Id*. The ALJ determined that while Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, Plaintiff's statements about the intensity, persistence and limiting effects of those symptoms were not entirely credible. *Id.* In support of her finding partially discounting Plaintiff's credibility, the ALJ reviewed Plaintiff's testimony and discussed nearly all of the factors outlined in SSR 96-7p in evaluating her credibility. *Id.* at 27-31. She reviewed each of Plaintiff's impairments in detail, particularly noting the stability of Plaintiff's aneurysm and the shrinking of the aneurysm which was then diagnosed as a mild ectasia and for which Dr. Popovic, a cardiologist, opined that it posed very minimal risk to her, except for lifting heavy weights, which was relative. *Id.* at 28, citing Tr. at 746. The ALJ noted that this countered Plaintiff's stated fears that her "aneurysm" may burst at any time. *Id.* at 28.

-16-

The ALJ also reviewed Plaintiff's complaints of neck, back and shoulder pain at her doctor visits and the doctors' clinical findings, as well as findings on MRIs and x-rays. *Id*. at 29-31. She reviewed Plaintiff's award of temporary total disability from worker's compensation and attributed it no weight, correctly explaining that she was not bound by another agency's determination that used a different standard for disability than the SSA. *Id*. at 28. The ALJ cited to Dr. Jones' December 2010 evaluation of Plaintiff after her workplace injury in which he reviewed her MRI and ordered physical therapy and concluded that Plaintiff did not do anything "really bad" to her left shoulder. *Id.* at 28, citing Tr. at 584. She also noted Dr. Bartos' medical examination in which he opined that Plaintiff could return to her work as a state tested nurse's aide without restrictions as her worker's compensation claim had been allowed for simple contusions of the left shoulder, buttock and thigh and she had reached medical maximum improvement. *Id*. at 29, citing Tr. at 530-531. The ALJ found Plaintiff more limited than Dr. Bartos. *Id*. at 29. The ALJ further noted Plaintiff's 2012 emergency room visit for back pain and the MRI which showed a L4-L5 annular tear with a disc bulge, a L5-S1 annular tear with a small disc bulge with no central or foraminal stenosis, and multilevel facet joint hypertrophy but no nerve entrapment or herniations. *Id*. at 30, citing Tr. at 580. The ALJ also cited to x-rays showing low grade bony hypertrophy with disc space narrowing at C6-C7, and the same at all levels in the thoracic x-rays, and low-grade facet and vertebral body arthropathy with disc space narrowing at L4-L5 and L5-S1. *Id.* at 30, citing Tr. at 706-711. The ALJ concluded that while these tests showed some limitations, they did not correspond with the severity of the pain and limitations that Plaintiff had alleged. *Id*. at 30.

In addition to reviewing each of Plaintiff's impairments and the objective testing, examinations, and opinions by various doctors, the ALJ also reviewed the various treatment modalities that Plaintiff used and underwent, including chiropractic treatment, medications, a TENS unit, physical therapy, and injections. Tr. at 28-31. The ALJ noted that Plaintiff's lower back pain finally began responding to a series of lumbar spine epidurals and a definite improvement was noted in December of 2013. *Id*. at 31, citing Tr. at 672. She also noted Plaintiff's testimony that she had started treatment with a new pain management doctor in 2014 and she had not been on any medications but did recently have a nerve block. *Id.* at 31. Finally, the ALJ cited to the opinions

-17-

of the state agency physicians and gave those opinions some weight, finding that Plaintiff's consistent reports of pain and recent nerve conduction studies required a sedentary work level as opposed to the light work level that those doctors had opined. *Id.*

As Plaintiff asserts, the ALJ did note that Plaintiff had a large gap in treatment and she indicated that this suggested that Plaintiff's symptoms were under some control. Tr. at 30. While erroneous, the undersigned recommends that the Court find that this was certainly not the only fact that the ALJ relied upon in making her credibility determination and was certainly not the only factor articulated by the ALJ in that determination, as evidenced by her review of the medical evidence and opinions, Plaintiff's treatment modalities, and Plaintiff's testimony concerning the location, duration, frequency and intensity of her pain.

For these reasons, the undersigned recommends that the Court find that the ALJ adequately applied the credibility assessment standard and substantial evidence supports her credibility determination.

### **B.** **CTS and ulnar palsies**

Plaintiff also asserts that the ALJ erred in not explaining why her bilateral CTS and ulnar palsies were not severe impairments at Step Two and the ALJ erred when she failed to include limitations concerning these two impairments in her RFC for Plaintiff. ECF Dkt. #16 at 22-24.

The undersigned recommends that the Court find that the ALJ's failure to explain why she did not include Plaintiff's CTS and ulnar palsies as severe impairments at Step Two is harmless error. At step two of the sequential steps for evaluating entitlement to social security benefits, a claimant must show that he or she suffers from a severe medically determinable physical or mental impairment. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is not considered severe when it "does not significantly limit [one's] physical or mental ability to do basic work activities." §404.1521(a).

Once the ALJ determines that a claimant suffers a severe impairment at step two, the analysis proceeds to step three; any failure to identify other impairments, or combinations of impairments, as severe in step two is harmless error. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir.1987). However, all of a claimant's impairments, severe and not severe, must be

-18-

considered at every subsequent step of the sequential evaluation process. See C.F.R. §404.1529(d); C.F.R. §§ 404.1520(d).

Here, Plaintiff fails to meet her burden of establishing that her CTS and ulnar nerve palsies were severe. She merely points to impressions from a nerve conduction study indicating early bilateral CTS and ulnar palsies in the elbows. ECF Dkt. #16 at 22-24; Tr. at 729. These impressions, or diagnoses alone, "say[] nothing about the severity of the condition." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The ALJ acknowledged these conditions in her decision, although not in Step Two. Tr. at 30, citing Tr. at 729. Plaintiff does not offer any explanation or evidence as to how these impairments meet the severity threshold for Step Two. In addition, the ALJ found that many of Plaintiff's other impairments to be severe at this Step and she proceeded through the sequential analysis. Tr. at 23-26. An ALJ's failure to include an impairment as severe at Step Two is not reversible error where the ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process as the ALJ could still properly consider the non-included impairment in determining a claimant's RFC. *See Maziarz*, 837 F.2d at 244 (Commissioner's failure to find claimant's cervical condition severe not reversible error since the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process).

Accordingly, the undersigned recommends that the Court find that the ALJ's failure to include early CTS and ulnar palsies as severe impairments at Step Two is not reversible error.

The undersigned further recommends that the Court find no merit to Plaintiff's assertion that the ALJ erred when she failed to include limitations in her RFC relating to the physician's impressions that Plaintiff had early CTS and ulnar palsies. Again, the ALJ cited to these conditions in her decision, but the doctor's impressions or mere diagnoses alone do not establish the severity of those impressions or diagnoses or the impact on the ability to perform work. *See Higgs*, 880 F.2d at 860; *see also Mullett v. Colvin*, No. 5:15CV144, 2015 WL 7779226, at *9 (N.D. Ohio Dec. 2, 2015), unpublished (diagnosis of CTS alone did not require ALJ to include limitations in RFC relating thereto). Moreover, Plaintiff fails to identify any specific limitations that the ALJ should have included regarding these conditions and she fails to refer the Court to evidence that the ALJ failed to consider relating to these conditions and any corresponding limitations. *See Mullett,* 2015

-19-

WL 7779226, at *9, unpublished (ALJ did not err in failing to include CTS limitations in RFC where claimant failed to bring forth evidence of doctor recommendation limitations relating to CTS and relying upon CTS diagnosis alone); *Kutscher v. Comm'r*, 2014 WL 3895220, at *13 (N.D. Ohio Aug. 8, 2014), unpublished (ALJ did not err in failing to account for RFC limitations relating to diagnoses of bilateral cervical radiculopathy and lumbar radiculopathy, cervical post laminectomy, and CTS as claimant failed to identify anything more than diagnoses, did not identify limitations resulting from diagnoses, and failed to cite to medical evidence showing those conditions caused significant functional limitations). In fact, a review of the medical record in the instant case shows numerous physical examinations finding that Plaintiff had normal grip strength testing and range of motion of the hands and wrists. *See* Tr. at 30, 281, 370, 378, 403, 409, 550, 552-557, 848.

Accordingly, the undersigned recommends that the Court find no merit to Plaintiff's assertions that the ALJ committed reversible error when she failed to include early CTS and ulnar palsies in the elbows at Step Two and in her RFC for Plaintiff.

## VII. CONCLUSION AND RECOMMENDATION

For the above reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and DISMISS Plaintiff's complaint in its entirety WITH PREJUDICE.


Date: January 31, 2017                */s/George J. Limbert*
                                       GEORGE J. LIMBERT
                                       UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).